**FOR PUBLICATION**

<table>
<tr><td>

UNITED STATES BANKRUPTCY
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-2(c)**

</td><td>

**FILED**
JAMES J. WALDRON, CLERK

August 28, 2007

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY:  s/ M. Cohen, DEPUTY

</td></tr>
<tr><td>

In Re:

MICHAEL TULLOCH,

           Debtor.

</td><td>

Case No.:        05-52915 (MS)

</td></tr>
<tr><td>

JERRY BIRDSALL, as Administrator of the Estate of
MEGHAN P. BIRDSALL,

           Plaintiff,
v.

MICHAEL TULLOCH,

           Defendant.

</td><td>

Adv. No.:        06-1657 (MS)

Judge:           Morris Stern, U.S.B.J.

</td></tr>
</table>

**OPINION**

**Appearances**

Robert M. Rich, Esq.
25 Pompton Avenue
Verona, NJ  07044
*Attorney for Plaintiff*

Keith O. D. Moses, Esq.
665 Newark Avenue
Jersey City, NJ  07306
*Attorney for Defendant*

**Morris Stern, United States Bankruptcy Judge**

I.      **Introduction**.

Plaintiff Jerry Birdsall sues debtor-defendant Michael Tulloch to except from bankruptcy discharge a debt arising out of the tragic 1998 death of plaintiff's twenty-year-old daughter, Meghan.  The exception-to-discharge allegations are grounded in 11 U.S.C. § 523(a)(6) (willful and malicious injury to Ms. Birdsall) and § 523(a)(9) (personal injury and death of Ms. Birdsall caused by operation of a motor vehicle while debtor was unlawfully intoxicated).   Meghan, a Boston University student, was the victim of a hit-and-run driver; that driver was determined by a Massachusetts court to have been Mr. Tulloch.  The court awarded the Birdsall family $2,077,146.51 in its wrongful death action against Tulloch.  Nevertheless, Tulloch testified before the bankruptcy court that he was not the hit-and-run driver (and was not in Boston, the locale of the accident, on the critical date).  Thus, the degree to which the Massachusetts court decision is preclusive in the bankruptcy court is central to this court's  consideration.

II.     **Procedural History.**

The events of June 19-22, 1998 (Friday night to the early hours of Monday morning) were the subject of a summary judgment liability decision of September 2, 2005, by Hon. Diane M. Kottmyer, Justice of the Superior Court (Suffolk County) of the Commonwealth of Massachusetts (the "Liability Decision") and her damages decision of October 31, 2005 (the "Damages Decision").  Tulloch, represented throughout in the state court case, did not offer a substantive defense to the ultimate dispositive motion on liability, nor to damages, relying

instead on his Fifth Amendment privilege and announcing his refusal to appear at trial.  He did

not appeal the state court Judgment.

In the years since the 1998 death, there has been no criminal prosecution or motor vehicle

violation asserted by Massachusetts authorities against the debtor.

On October 14, 2005 debtor filed a Chapter 7 bankruptcy petition.  Initially, the Birdsall

claim was not scheduled by Tulloch (though the litigation was listed as pending in his Statement

of Financial Affairs).[1]  Amended schedules were eventually filed, Birdsall was notified of the

bankruptcy case, and he filed a timely complaint initiating this adversary proceeding.  The

complaint was answered by Tulloch, *pro se*.  Some weeks before the ultimate trial date (June 14,

2007), Tulloch retained trial counsel.  Trial proceeded on that date.


**III.    Jurisdiction.**

Exception-to-discharge adversary proceedings are "core proceedings" arising under title

11 and, as such, bankruptcy judges may "hear and determine" such matters and "enter

appropriate orders and judgments" therein.  *See* 28 U.S.C. § 157(b)(1); and *see also*

§ 157(b)(2)(I) (rendering "determination as to dischargeability of particular debts" core).

*Compare and contrast* § 157(b)(2)(B) (*excepting* from core proceedings those otherwise core

matters of allowance or disallowance of claims requiring "the liquidation or estimation of

contingent or unliquidated personal injury tort or wrongful death claims against the estate for

purposes of distribution in a case under title 11"); § 157(b)(5) ("personal injury tort and wrongful

---

[1]Because the Birdsall claim was not scheduled, there was no notice given the plaintiff and
hence the Damages Decision and Judgment were entered on October 31, 2005, post-petition.  No
objection to the entry has been made by the debtor, and at this point none would be entertained
by this court.

death claims shall be tried in the *district court*") (emphasis added).  This court thus has

jurisdiction to hear and determine this adversary proceeding as to the dischargeability of the

Birdsall debt, given that the state court has already liquidated the wrongful death damages.


**IV.**   **Trial Exhibits and Testimony.**

The one-day trial included a threshold "Statement of Uncontested Facts" stipulated to by

counsel.  Included in the Statement as "true copy" exhibits were the state court complaint, the

Liability Decision and the Damages Decision and Judgment.[2]  The latter three items bore

indications of a 2001 Superior Court docket number.  The only other documentary evidence was

a car repair estimate issued to Tulloch by a Nashua, New Hampshire auto collision repair shop

(P-1) and Meghan Birdsall's death certificate (P-2).

Tulloch, initially called by the plaintiff as an adverse witness, provided the only trial

testimony.

**A.**    **Liability Decision**.

The September 2, 2005 Liability Decision was rendered on the Birdsall motion for

summary judgment.[3]  Given the significance of this Decision and the paucity of other

documentary evidence and testimony in this case, the Summary Judgment Record (as that term

was used in the Decision) is included hereinafter, *in toto*.

---

[2]The Statement of Uncontested Facts included a stipulation that Tulloch had been served with the Superior Court complaint, that he "was represented by counsel during the aforesaid litigation," that no appeal was taken from the Judgment, and that Tulloch "never reported the accident described in the Complaint."

[3]Neither party provided any part of the Superior Court file other than the "true copy" exhibits.  Thus, the underlying support for the summary judgment motion (granted on reconsideration) was not available to this court.

On Monday, June 22, 1998, at about 1:50 a.m., Meghan Birdsall was found lying in the service lane of Commonwealth Avenue at or near the intersection of Commonwealth Avenue and Brighton Avenue. Her bicycle was found on the ground near her. Meghan Birdsall was unconscious; she had suffered serious injuries, including a severe break of her left leg and blunt trauma to her head. She did not regain consciousness and was pronounced dead on June 25, 1998.

On June 30, 1998, the Defendant, Michael Tulloch, brought his vehicle to Gate City Collision in Nashua, New Hampshire ("Gate City") to obtain an estimate for the repair of damage to a fender and door. Cynthia Graham-Borden, an appraiser with approximately twenty years experience, evaluated the damage. She observed that the fender was caved in and there was damage to the lower part of the door and the rocker panel.[FN2] The damage extended from the fender behind the right wheel to the middle of the rear door. Graham-Borden saw what appeared to be dried blood and tissue on the vehicle. There was no fur, hair or other indication that the blood and tissue resulted from contact with an animal. She asked: "What is this, blood and guts?" The defendant said he did not know what it was. Graham-Borden asked if he knew that he had hit something other than an animal. He told Graham-Borden that he let "a friend" borrow his car and the friend had an accident. He said he didn't know whether the car hit a person. The defendant said that he wanted to pay cash for the repairs and wanted to have the car fixed immediately. He said that he did not intend to make an insurance claim because he did not know how the accident happened. Graham-Borden could not schedule the repairs immediately and Tulloch did not wait for the next available date. Gate City had repaired Tulloch's car on several previous occasions. On past occasions, Tulloch was relaxed and friendly with Graham-Borden and other Gate City employees. On this occasion, he appeared to be nervous.

[FN2] The record is unclear as to which side of the vehicle was damaged. The rocker panel is the section of the car immediately beneath the door and is made of strong metal as it is part of the body of the car.

A company called MAACO repaired the damage to Tulloch's vehicle. Graham-Borden saw the car after it had been repaired by Maaco. Although on previous occasions Tulloch had been very particular about the condition of his car and the quality of repairs

performed by Gate City, she observed that the quality of the repair work performed by Maaco was poor.

Gate City notified the Nashua, New Hampshire police of Graham-Borden's observations of damage on Tulloch's car and they got in touch with officers investigating Meghan Birdsall's death who interviewed the defendant on two occasions. At the initial interview, defendant told investigating police officers that on the Friday, June 20, 1998, he was drinking and did not remember driving home as he had been drinking so heavily that he reached a blackout state. He said that he "may have hit someone." In a subsequent interview, the defendant said that on June 20, 1998, he was with friends in Boston, at a party, was intoxicated when he left the party and "hit a wall", that he slept in his car and awoke the next morning with vomit on his clothing. [FN3]

[FN3] On both occasions Tulloch told police that he was at the VFW playing cards on the Sunday night in question. He is, however, precluded from offering evidence of an alibi as a result of discovery violations.

Tulloch has asserted his Fifth Amendment privilege against self-incrimination and has refused to provide discovery in this case, including documents, answers to interrogatories and deposition testimony seeking evidence, *inter alia,* as to whether Tulloch was intoxicated on the night of June 21-22, 1998, and whether he struck Ms. Birdsall with his car. It is stipulated that he will not attend the trial and will not testify. He is precluded from calling an expert or presenting alibi witnesses as a result of discovery violations.

On this record, the Superior Court concluded that Tulloch had not complied with court rules, and his counsel's request for a continuance (apparently based upon exercise of the privilege) was deemed nonresponsive to Birdsall's summary judgment motion.[4] Moreover, it was held that Massachusetts law provides that "[i]n a civil case, an inference adverse to the party asserting the privilege against self-incrimination may be drawn."

_____

[4]The Superior Court concluded, as well, that "[t]o avoid summary judgment, an opposing party may not rely upon his pleadings or conclusions but 'must set forth specific facts showing that there is a genuine issue of trial.' MASS. R. CIV. P. 56(e). Tulloch has failed to do so and it is stipulated that he will not testify at trial."

In the Decision's key paragraph, the Superior Court found as follows:

> The evidence adduced by the Plaintiff, including the type and location of damage to the vehicle, the presence of blood and tissue on the defendant's vehicle on June 30, 1998, the defendant's conduct in connection with repairs, his statements that he drank to the extent that he reached a blackout stage and may have hit someone on the Friday night preceding the accident, his statement that he lent the car to a friend which he subsequently contradicted, in combination with the adverse inference created by defendant's assertion of the Fifth Amendment, is such that no rational juror could find that the plaintiff has not met his burden of proving by a preponderance of the evidence that Tulloch was the driver of the vehicle that struck Meghan Birdsall.

**B.    Tulloch Testimony.**

Tulloch testified in this court, without reference to the Fifth Amendment privilege. As to *when* he was in Boston on the critical 1998 weekend, his testimony included the following:

Q    Excuse me, June 20th was a Saturday?
A    Yeah.
Q    Were you in Boston on June 20th?
A    No, it was more the 19th.
Q    You were there the 19th?
A    Um-hm.
Q    And, when did you return to New Hampshire?
A    Sunday morning about – I mean, I'm sorry, Saturday morning about 7, 8 in the morning, I went driving back.

Tr. 16:1-9.

Regarding "hitting" someone, Tulloch testified as follows:

Q    And, did you tell the police that you think at some time over that weekend that you believe you may have hit someone?
A    Well, they kind of coaxed me into it, but I probably said that, yeah.
Q    Did you say that?
A    Yeah, if they have it on record, yeah, that's what I said, if I recall.
Q    And, you never stopped your car even though that you think you may have hit someone?
A    I don't remember stopping or going or anything like that. I remember when I had left the venue and kind of driving into the gas station early that morning, kind of blacked out.

7

| | |
|---|---|
| Q | So, you don't remember what you were doing when you were driving during parts of that weekend, correct? |
| A | Yeah, between Friday night to – |
| | MR. MOSES:  Objection.  Objection.  Could counsel be specific as to the time and the date that he's referring to? |
| | THE COURT:  Mr. Rich, if you can get specific – |
| Q | What parts of the – |
| | MR. RICH:    Yes. |
| | THE COURT: – as to your question? |
| Q | What parts of the weekend were you not sure what you were doing when you were driving? |
| A | Between Friday night around 11, 12 o'clock, to, the sun was just getting up, so it had to be Saturday around 5, 6 in the morning, 6, 7. It was pretty early, morning, Saturday. |

Tr. 16:25 to 17:25.

Tulloch acknowledged being served with the Birdsall summons and complaint in the Massachusetts case, being under criminal investigation at that time, retaining a criminal lawyer, and being represented by the "insurance company lawyer" for the civil case.  Tr. 18:1-19:2.

Civil trial counsel was specified to have been involved on Tulloch's behalf at the time of the ultimate summary judgment motion in state court and when the Damages Decision was entered.  Tr. 20:3 to 21:20.  Ultimately, Tulloch acknowledged that the civil case might have started "around 2001" ("sounds about accurate"), that he received "all these yellow letters from the . . . insurance lawyer," and that he attended one deposition in the case.  Tr. 47:2-25.

Tulloch flatly denied being in an accident on June 22, 1998 (at approximately 1 a.m.).  Tr. 21:25 to 22:3; 23:5-6.[5]  He also denied being intoxicated on that date.  Tr. 25:12-14.  *See also* Tr. 32:13-15.

---

[5]The preclusive effect of the state court decision was raised by plaintiff's counsel at this point in the testimony and reserved for decision by the court.  Tr. 23:7 to 24:8.

The degree of Tulloch's drunkenness, at least on June 19 into June 20, was by his

explanation extraordinary.

> Q    Sir, when – there's no question that on the evening of the 19th and
> into the 20th, that's from Friday night to Saturday, you were driving
> your car and you can't tell us where you were driving because you
> were so drunk you had been blacked out, correct?
> A    Yeah.

Tr. 25:19-24.

> Q    So, for four or five hours you were driving your car and you had no
> recollection of where you were driving because you were absolutely
> drunk?
> A    Yes.
> Q    And, you had no problem with that, did you?
> A    No, I felt very bad about it after the fact, but I mean, it happened.  I
> mean, wasn't my intention.
> Q    And, when you woke up or came to you were covered with vomit,
> sitting at a gas station?
> A    Yes.
> Q    In another State?
> A    Well, I don't know if I was sitting in there, I think I pulled in and
> kind of came to and looked down when I got out of the car.  And,
> yeah, it's vomit.
> Q    And, you told the police that during that time you believed you may
> have hit somebody but you never stopped?
> A    Well, they kind of coaxed me into that, they didn't tell me the dates
> or anything.
> Q    But, you did tell the police that?
> A    Yeah, I probably said that, yeah.  But, it's in the context, if you see
> the whole thing it's pretty clear.

Tr. 26:25 to 27:20.

Tulloch maintained that on Sunday night (June 21) he was playing cards in the Nashua,

New Hampshire VFW Hall.  Tr. 27:21-23; 32:9-12.

Tulloch explained that he had friends in Boston and on weekends he would frequently

drive from Nashua to Boston.

9

| Q | Okay. And, did you frequently on weekends go from Nashua to Boston to visit friends or for other reasons? |
|---|---|
| A | Yes. |
| Q | Reasons of recreation? |
| A | Well, not only that, but mostly, yeah, all my friends were down there. |
| Q | Yeah, to see your friends? |
| A | Yeah. Yeah. For the most part. |
| Q | So, all your friends were in Boston? |
| A | Some of them. Both – both of them, yeah. |
| Q | Okay. And, when you went from Nashua to Boston on weekends would you frequently drink during those weekend visits in Boston? |
| A | Yeah, I did. Not all the time – I mean behind the wheel, but, yeah, I did. |
| Q | Okay. And, would you stay in Boston overnight? |
| A | Sometimes, It wasn't majority. |
| Q | And, where would you stay? |
| A | Crash on a friend's couch, or. |
| Q | Okay. And, when would you – when you did that when would you go back to Nashua? |
| A | Usually go back Sunday night, sometimes on Saturday, depends. |
| Q | Okay. |
| A | It wasn't – I'd stay down there all weekend, 'cause, you know, you don't want to inconvenience anybody. |

Tr. 36:3-25 to 37:1-3.

Tulloch testified to his Friday night drinking (three or four beers at a friend's apartment

followed by punch at a house party):

| Q | You were drinking beers at a friend's house, -- |
|---|---|
| A | Um-hm. |
| Q | – and that was the three or four beers? |
| A | Yeah. |
| Q | Any hard liquor? |
| A | No. That's what kind of struck – I do remember that. |
| Q | Okay. And, then you left the friend's house? |
| A | Um-hm. |
| Q | And, where did you go? |
| A | To the – to the house party. |
| Q | And, where was the house party? |
| A | It was – I wasn't sure, I think it was Dorchester area, it's still in the immediate Boston area, but I'd have put it, it was kind of in the hood, so, it wasn't the best area. |
| Q | South Boston? |

10

| | |
|---|---|
| A | I really didn't know Boston back then, you know, but I don't think it was South. |
| Q | Okay.  And, you say you got to that house party at around 11 o'clock at night? |
| A | Yeah, I'd say, yeah, because, you know, by the time I drove down to Boston, I met up with my friend, went to his place, had a couple, talked, they told me about the party, we went there.  So, best estimate, yeah, around 10, 11. |
| Q | Okay.  And, what did you drink at the house party? |
| A | I remember this punch.  And, I had some of that and it kind of hit me pretty fast, you know, I'm a big guy and back then I was pretty big, and usually three or four beers you didn't think nothing of it.  But, I had the punch, you know, I remember walking out to the stoop to get some air after drinking it, because I'm like, you know, what's in this punch?  I thought I was all right, I was like, well, you know maybe just go home.  And then, went around the corner, got in my car, and – |
| Q | All right.  Did you have anything by way of alcoholic beverages at the house party besides the punch? |
| A | No.  I wasn't even there that long.  So, -- |
| Q | You didn't have a beer there? |
| A | Not that I recall.  I remember the punch bowl was kind at the front, it was one of the first things we grabbed for. |

Tr. 38:14 to 40:2.

Tulloch, drunk, described post-party events as follows:

| | |
|---|---|
| Q | All right.  And, when you left the party, where did you go, if you remember? |
| A | I remember trying to pull out and it was a tight street, so half the car was like kind of on the sidewalk, the other half was off, and you know this was a party so there was a lot of people there and I was kind of jammed in pretty tight.  After getting out of that I don't really remember too much. |
| Q | Do you remember anything? |
| A | Outside of pulling out?  No. |
| Q | Do you remember driving on any of the Boston streets going back to Nashua that night? |
| A | No. |
| Q | Do you remember pulling your car over during that night at any time? |
| A | No. |
| Q | Do you remember pulling into a gas station at any time during that night? |

A       Yeah, like around 6 in the morning when I kind of came to and I pull into the gas station off the highway.

Q       When you say you came to and pulled into a gas station, when you came to, were you driving?

A       Yes.  Yes.

Q       The car was moving when you came to?

A       As far as I recall, because I don't remember waking up at the gas station, I remember pulling up into it, so maybe it must have been while I was moving.

Q       But, specifically when you came to were you operating the vehicle and was it moving?

A       I believe so, because I don't remember waking up sitting in the gas station, the attendant might have came out, so.

Q       All right.  And so, --

A       It must have happened while I was driving.

Q       So, when you came to you were operating the vehicle, driving it, and what was your reaction at that time, tell me?

A       Like, wow, you know.  It's like, where am I at?  And then, when I got out and saw the vomit, I was like, man, must have been a crazy night. And then, --

Q       Well, okay, so now you're operating the vehicle, you come to and you find yourself driving, is that correct?

A       Yeah.  Yeah, because I wasn't stopped.

Q       And, now you're – now, did you then pull into a gas station?

A       No, I think I was on the highway and realized, you know, I wasn't sure where I was at, and I pulled off the next exit, and that's when I found the gas station.

Q       Okay.  And, what highway were you on?

A       I'm not sure.

Tr. 41:3 to 42:24.

Tulloch maintained that his episodic drunken venture culminated when he "came to"

Saturday morning.

Q       And, you said it was Saturday morning?

A       Yeah, it was definitely Saturday morning.

Q       And, did you get out of the car, sir?

A       Yes.

Q       And, what did you observe?

A       When I first got out I realized that I had vomit all over my shirt and pants, and I was like, God, you know.  So, I went into the store, grabbed something to drink and eat quickly and I remember the guy looking at me like I was crazy.  And, I asked him directions, he

12

> wasn't sure, and I just kind of went off and eventually found my way home.
>
> Q    All right.   And, when you say you cleaned yourself up, had something to eat, at that time, did you know where you were?
>
> A    No, not exact.  No.  I know I was off a major highway and I was trying to get my way back to Route 3 to go –
>
> Q    And, did you know which highway you were off at that time?
>
> A    No.  No.
>
> Q    And, did you ask directions to get back to Route 3?
>
> A    Yeah, I believe I did, but he didn't really help me.  Because I remember having to drive around for a little while and then finally got my bearings and found 3 and went home.

Tr. 44:2-22

The witness acknowledged that, within a year before the June 1998 incident, he was arrested for drunk driving and had his license suspended for six months.  Tr. 52:4 to 53:16. Tulloch indicated that the events leading to this suspension were "nowhere near what happened" on the weekend in June 1998.

> Q    Okay.  And, do you recall the events leading up to the time that you were pulled over and taken to jail which resulted in the six-month suspension of your license?
>
> A    Yeah, actually I do.
>
> Q    What happened?
>
> A    It was a – it was a Saturday morning, woke up on a friend's couch, had the – wanted to bring the car to somebody in New Hampshire that – I got one of those things in the mail that said trade in your car, so I think it was like between 9 and 12, and it was like Saturday morning, I woke up I was like, eh, I have to get out there.  And, I was driving and when – apparently by the time I got to New Hampshire someone had called the cops saying I was driving erratically but I was rushing to get to the car dealership.  *And, yeah, I mean I was still kind of hazy from the – you know, hanging out with friends on a Friday night, but nowhere near what happened on – was it, in '98.* But, because of the erratic driving is why they pulled –
>
> Q    You mean '98 was, in that sense, worse that you were more under the influence?
>
> A    I don't remember, yeah, that's – that's bad.

Tr. 54:4-24 (emphasis added).

13

**V.**     **The Preclusive Effect of the Liability Decision**.

What, if any, issues currently before the bankruptcy court were preclusively decided by

the Superior Court?

**A.**     **Issue Preclusion – Law to be Applied.**

Issue preclusion in federal cases following earlier state court decisions is, initially, a

function of 28 U.S.C. § 1738, the Full Faith and Credit Statute.  State court judgments "shall

have the same full faith and credit in every court within the United States . . . as they have by law

or usage in the courts of such State. . . ."  *Id.*  Barring some overriding precept (i.e., an exception

read into the Statute), the Superior Court judgment is to be given the same effect in this

bankruptcy court as would be given in the jurisdiction of its issue.  *See, e.g., San Remo Hotel,*

*L.P. v. City and County of San Francisco,*  545 U.S. 323 (2005); *Marrese v. Am. Acad. of*

*Orthopaedic Surgeons*, 470 U.S. 373 (1985); *In re Heckert*, 272 F.3d 253, 257-60 (4th Cir. 2001).

Thus, the preclusion law of the Commonwealth of Massachusetts would have application here.

*See, generally,* 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, § 132 (3d ed. 2007)

("MOORE'S").[6]

---

[6]The treatise notes a *possible* bankruptcy exception to federal full faith and credit where
*default judgments* are entered in state courts, particularly where bankruptcy courts have
exclusive jurisdiction to determine exception to discharge for certain debts.  MOORE'S at
§ 132.03[2][k][iii][A].  *Sub judice*, summary judgment was entered, and though the Fifth
Amendment privilege was exercised, judgment was not, strictly speaking, a function of
"default."  Moreover, while § 523(a)(6) willful and malicious injury exception claims are
*specified* to be determined exclusively by bankruptcy courts (via the filing of timely adversary
proceeding complaints per FED. R. BANKR. P. 4007), the same is not required of § 523(a)(9)
drunk driving claims.  *See* § 523(c).  Other exceptions to the application of full faith and credit
(e.g., lack of predicate court jurisdiction or fraud in the procurement of a judgment) are not
implicated here.  *See, e.g., In re Miloszar*, 238 B.R. 266, 270 (D.N.J. 1999).

*Grogan v. Garner*, 498 U.S. 279 (1991), put to rest any doubt about the applicability of

the principles of collateral estoppel (i.e., issue preclusion, as distinguished from claim

preclusion) in bankruptcy proceedings.  "We now clarify that collateral estoppel principles do

indeed apply in discharge exception proceedings pursuant to § 523(a)."  498 U.S. at 284 n.11.[7]

Moreover, *Grogan* cited with seeming approval RESTATEMENT (SECOND) OF JUDGMENTS § 27

(1982).  498 U.S. at 284-85.  *See In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997).  It has thus

become clear that *federal* issue preclusion law is guided by § 27, as is much of the corresponding

state law.  The Commonwealth of Massachusetts adheres to the precepts of the August 28, 2007,

and specifically to § 27.  *In re Am. Bridge Prod., Inc.,* 328 B.R. 274, 351 (Bankr. D. Mass. 2005)

("Massachusetts courts have referred to the Restatement (Second) of Judgments in applying the

doctrine of collateral estoppel or issue preclusion") *(quoting Cousineau v. Laramee*, 388 Mass.

859, 863 n.4 (Mass. 1983) (*citing* RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982)).  This

RESTATEMENT section provides:

> When an issue of fact or law is actually litigated and determined by
> a valid and final judgment, and the determination is essential to the
> judgment, the determination is conclusive in a subsequent action
> between the parties, whether on the same or a different claim.

---

[7]Much of the focus of Supreme Court bankruptcy-preclusion cases has been on the fraud
exception to discharge (§ 523(a)(2)), and whether prepetition cases were preclusive.  Note that
§ 523(a)(2) exception allegations must be established in the bankruptcy court per § 523(c).
And, *claim* preclusion (i.e., "*res judicata*") was the initial focus of the Court.  *Brown v. Felsen*,
442 U.S. 127 (1979).  *See also Archer v. Warner*, 538 U.S. 314 (2003).  *Brown*, endorsed by
A*rcher*, reasons that the changes in bankruptcy legislation in 1970 reflect Congress' intent to
commit certain discharge exceptions to the exclusive jurisdiction of federal courts.  442 U.S. at
135-36.  In addition, when parties litigate a dispute arising from state law, they typically do not
contemplate the possibility of bankruptcy.  Thus *claims* of exception to discharge are deemed not
to have been adequately litigated previously, 442 U.S. at 136-37.  The Full Faith and Credit
Statute would *not* apply *res judicata* in bankruptcy exception-to-discharge proceedings such as
in the case at bar.

In the case at bar the dominant question is whether issues of fact and law which would establish some or all of the elements of at least one of the alleged exceptions to discharge were "actually litigated" by the Superior Court (and, if so, which elements). Related to and perhaps subsumed in the foregoing, is the question of the essentiality to the Superior Court judgment of any such litigated element.[8]

**B.    Standard for Determining Issues "Actually Litigated" in the Superior Court.**

*Treglia v. MacDonald*, 430 Mass. 237 (Mass. 1999), is instructive in assessing whether issues of fact or law have actually been litigated in prior actions. The United States Bankruptcy Appellate Panel for the First Circuit had certified the following question to the Supreme Judicial Court of Massachusetts:

> When a defendant appears in a civil action, files a motion seeking interlocutory relief, obtains that relief, but does not thereafter answer or defend; and when, after a damage hearing (in which the defendant does not participate), default judgment enters; does Massachusetts law preclude the defendant's litigation of the substantive elements underlying the default judgment in a subsequent action initiated by the same plaintiffs?

*Id.* at 237. In bankruptcy, creditors Treglia asserted that a fraud-based default judgment previously obtained by them in state court was preclusive as to issues raised in their § 523(a)(2)(A) fraud exception-to-discharge complaint. Debtor-MacDonald's only activity in the state court case was to move (twice) to discharge pretrial attachments obtained *ex parte* by

---

[8]This court finds the Superior Court judgment to be a "final and valid judgment," and indeed is unchallenged by Tulloch in that regard. The question of *essentiality* of issue determination is viewed by this court as being theoretically dependent upon what issues are identified as having been "actually litigated," though the Superior Court Liability Decision has no gratuitous, nonessential findings. That Decision identifies Tulloch as the hit-and-run driver of the vehicle which struck Meghan Birdsall and cited his state of drunkenness as a building block in reaching the ultimate conclusion. It is likewise obvious that the Superior Court concluded Tulloch's negligence was the cause of the death.

16

Treglia.  "Neither MacDonald nor his counsel participated in any other respect in the Superior

Court action.  MacDonald did not answer the complaint, and . . . a default judgment was entered

against him."  *Id*. at 238.

In answering the posited question in the negative, the Supreme Judicial Court cited the

RESTATEMENT'S general proposition that default judgments are not preclusive.  The Court relied

heavily on § 27 comment e, at 257 ("In the case of a judgment entered by confession, consent, or

default, none of the issues is actually litigated"), noting, however, the comment's allowance

"that in some circumstances 'even if [an issue] was not litigated, the party's reasons for not

litigating in the prior action may be such that preclusion would be appropriate.'"  *Id*. at 241.  The

"wrinkle" in *Treglia*, i.e., motions to discharge attachments, did not amount to sufficient

participation by MacDonald in the prior litigation.

Summing up the facts, the Court stated:

> In this case, the Treglias obtained their attachment on MacDonald's
> property without MacDonald's having an opportunity to be heard.
> When notified of the attachment, MacDonald sought successfully to
> modify and discharge it. He did not otherwise attempt to defend
> himself from the fraud charges made by the Treglias against him.
> [FN7]  While he filed an appearance in the Superior Court, there is
> nothing to suggest that the issue of fraud or any other issue of
> liability was "fully litigated."  We agree with the judge in the
> bankruptcy court that the judge in the Superior Court "received
> evidence only as to the amount of damages. As to liability, the court
> received no evidence and made no findings of fact or conclusions of
> law."  On this record, we cannot conclude that the issue of fraud
> raised by the Treglias was "actually litigated" in the Superior Court.

> [FN7]  The record does not establish why MacDonald chose not to
> contest the Treglias' assertion of fraud in the Superior Court. In light
> of his subsequent invocation of the protection of the bankruptcy
> court, MacDonald may have sought to conserve both his own
> resources and judicial resources by a single proceeding in the
> bankruptcy court.

*Id*. at 242.

Finally, the Court cautioned regarding circumstances where, following default judgment, an issue may be given preclusive effect "in subsequent litigation between the same parties":

> We can, for example, envision circumstances in which a litigant may so utilize our court system in pretrial procedures, but nonetheless be defaulted for some reason, that the principle and rationale behind collateral estoppel would apply. *See, e.g.*, *Matter of Gober*, 100 F.3d 1195 (5th Cir.1996) (holding that default judgment based on failure to answer does not support issue preclusion but where default issued as discovery sanction against defendant debtor after two years of litigation in which defendant had answered and denied all allegations of complaint, collateral estoppel applied); *In re Bush*, 62 F.3d 1319, 1324 (11th Cir. 1995) (applying collateral estoppel effect to prior default judgment against debtor based on fraud, where debtor "actively participated" in adversary process for almost one year through filing answer, counterclaim, and discovery requests).

*Id*. at 242-43. For a thorough review and analysis of the exception to the general rule that default judgments do not satisfy the "actually litigated" requirement for collateral estoppel, *see In Re Pomeroy*, 353 B.R. 371 (Bankr. D. Mass. 2006).[9]

## C.    Comparing Debtor's Participation In Prior Case with Massachusetts Standard.

Participation by Tulloch in the previous Superior Court case, at a minimum, included:

(i)    His appearance through counsel (said by Tulloch to be "insurance" counsel), who apparently answered the complaint, and continued

---

[9]*Pomeroy*, like the Third Circuit case of *In re Docteroff*, *supra*, applied collateral estoppel in an exception-to-discharge adversary proceeding following a *federal* case default judgment arising from discovery sanctions. *Pomeroy* supports analysis along a continuum of participation in the predicate case (including the relative vagueness inherent in determining when that participation is sufficiently "substantial" for collateral estoppel purposes). In this regard, *Pomeroy* disagrees with *In re Gilson*, 250 B.R. 226 (Bankr. E.D. Va. 2000), which rejects the continuum approach as being too arbitrary. *See Pomeroy*, 353 B.R. at 382.

representing Tulloch through the rendering of summary judgment on

liability and the Damages Decision;

(ii)     His long-term status as a litigant in a case docketed in the court year

"2001," at least through October, 2005;

(iii)    His receipt at least through counsel of written discovery to which Tulloch

failed to respond;

(iv)    His attendance at a deposition; and

(v)     Counsel's particular activity in response to Birdsall's summary judgment

motion (i.e., a request for continuance based upon Tulloch's assertion of

his Fifth Amendment privilege).

Such participation is certainly more than that of the defendant-debtor in *Treglia.* Moreover, it is

coupled with the obvious strategic interplay between criminal counsel's advice and that of the

civil case attorney, as that strategy would impact on discovery by the plaintiff, pretrial motions,

and, ultimately, the potential for trial. Indeed, this litigation activity appears to be sufficient to

qualify as *actual* litigation (either in quantum terms or by virtue of Tulloch's use or abuse of the

court system) for issue preclusion when admeasured against the "principle and rationale behind

collateral estoppel."[10] *Treglia*, 430 Mass. at 242.

---

[10]"The purpose of the doctrine [collateral estoppel] is to conserve judicial resources, to
prevent the unnecessary costs associated with multiple litigation, and to ensure the finality of
judgments." *Martin v. Ring*, 401 Mass. 59, 61 (Mass. 1987)*, referenced in In re Am. Bridge
Prod., Inc.*, 328 B.R. at 351. "The doctrine is intended to avoid inconsistent judgments and the
related misadventures associated with giving a party a second bite at the apple." Christopher
Klein, et al., *Principles of Preclusion and Estoppel in Bankruptcy Cases*, 79 AM. BANKR. L.J.
839, 852 (2005). "Collateral estoppel, like the related doctrine of res judicata, has the dual
purpose of protecting litigants from the burden of relitigating an identical issue with the same
party or his privy and of promoting judicial economy by preventing needless litigation."
*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979). *See also E. Pilots Merger Comm.*

The immediate case is not a *Treglia*-type default case, i.e., one in which no answer was filed and participation by the defendant was plainly on the periphery of the case.  In fact, the matter here was not the subject of a default judgment.  Moreover, the question of participation of the defendant in the state case was substantial in comparison to *Treglia*, and the use (if not abuse) of the court system, as in the *Treglia*-cited *Gober* and *Bush* cases, is clear.  This court thus concludes that, *absent some overriding concern arising out of exercise here of the Fifth Amendment privilege* (*not* a factor discussed in *Treglia*), the Supreme Judicial Court of Massachusetts would deem those issues decided by the Superior Court in the Birdsall civil action to have been "actually litigated" for issue preclusion purposes.

### D.    Specific Import of Debtor's Prior Exercise of Fifth Amendment Privilege.

Tulloch's Fifth Amendment privilege exercise in state court reflects upon whether issues were "actually litigated" there, and, if so, which issues were so litigated and are thus (assuming their essentiality to the Liability Decision), preclusively decided.

*In re Rutledge*, 245 B.R. 678 (Bankr. D. Kan. 1999), closely parallels the framework of the matter at bar.  Debtors Rutledge had suffered a state court judgment grounded in fraud.  In that case, the Rutledges invoked their Fifth Amendment privilege not to testify.  Their subsequent Chapter 7 bankruptcy case included the judgment-creditor's adversary proceeding to except the judgment debt from discharge (§ 523(a)(2)(A)).  In finding that the fraud issue was "actually litigated" for collateral estoppel purposes, the Bankruptcy Court held:

> Where a plaintiff in a state court proceeding pleads the issue sought
> to be precluded, and the defendant files an answer to the charges, and

*v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 279 F.3d 226, 232 (3d Cir. 2002).

> the state court receives evidence on the pleadings, the requirement
> that the issues be "actually litigated" is satisfied. There is no
> requirement that the defendant actually testify in his or her defense
> in the prior proceedings. Invocation of the Fifth Amendment
> privilege in the prior suit does not bar a conclusion by this court that
> the merits of the case were necessarily adjudicated. As reasoned in
> *National Acceptance Co. v. Bathalter (In re Bathalter)*, a party cannot
> avoid a judgment simply because the Fifth Amendment shield is
> invoked, and, despite the debtor's choice to invoke his Fifth
> Amendment privilege, the prior action did satisfy the "actually
> litigated" requirement for collateral estoppel.

*Id.* at 683 (footnotes omitted).

In re Bathalter, 123 B.R. 568 (S.D. Ohio 1990), *aff'd* 951 F.2d 349 (6th Cir. 1991), relied

upon in *Rutledge*, was also a fraud exception-to-discharge adversary proceeding.  There, a

Northern District of Illinois judgment was the estopping predicate.  The Illinois case was first the

subject of a *judgment on the pleadings* after defendant's answer asserted (in largest part), the

Fifth Amendment privilege.  On appeal, the Seventh Circuit acknowledged that in *civil cases*

adverse inferences could be drawn from the invoking of the Fifth Amendment.  *Nat'l Acceptance*

*Co. of Am. v. Bathalter*, 705 F.2d 924, 929 (7th Cir. 1983) (*citing and quoting Baxter v.*

*Palmigiano*, 425 U.S. 308 (1976)).  Nevertheless, it reversed the District Court ("[A] judgment

imposing liability cannot rest solely upon a privileged refusal to admit or deny at the pleading

stage . . . defendant's claim of privilege should not have been deemed an admission, and that

plaintiff should have been put to its proof, either by way of evidentiary support for a motion for

summary judgment or at trial."[11]  705 F.2d at 932.  Thereafter, on remand, the District Court

---

[11]While invoking the Fifth Amendment privilege in civil proceedings may give rise to an
adverse inference, a party seeking to rely on the inference must offer probative evidence of the
asserted cause.  The inference alone does not constitute sufficient probative proof.  *In re*
*Cunningham*, 365 B.R. 352, 362-63 (Bankr. D. Mass. 2007).  The requirement for probative
evidence of a cause, independent of the adverse inference, is consistent with Massachusetts
precedent.  *See Frizado v. Frizado*, 420 Mass. 592, 596 (Mass. 1995), cited in the Liability

granted *summary judgment*.  The Bankruptcy Court's view of the decision on remand is as

follows:

> The [Illinois District Court on remand] reviewed the voluminous
> evidence supporting the motion and, finding no genuine issues in
> dispute, granted the motion. In so doing, the Court determined that
> the Seventh Circuit Court of Appeals had stated that NAC could
> present its complaint by way of a motion for summary judgment,
> strongly implying, at the very least, that the Debtor could not rely
> upon his Fifth Amendment Privilege alone to shield him from an
> adverse judgment. The District Court agreed with the Seventh
> Circuit's conclusions.  Accordingly, a Judgment Order was entered
> in favor of NAC and against Debtor in the amount of $8,646,211.83.

123 B.R. at 570.

Ultimately, the Bankruptcy Court in *Bathalter* reached the "actually litigated"

conclusion, based in part upon the proposition "that a party can not avoid judgment simply

because the Fifth Amendment shield has been invoked," and "[f]urther, the Record on Appeal is

replete with demonstrations that [debtor] led a spirited defense throughout all relevant

proceedings." 123 B.R. at 572.  The unpublished Sixth Circuit affirmance noted:

> [T]he defendant, through counsel, vigorously defended the suit
> throughout.  He had an opportunity to address the merits without
> waiving his Fifth Amendment right.  He made a voluntary tactical
> decision, the consequence of which he must now face. . . .

1991 WL 263474, at *3 (indexed in 951 F.2d 349).  *See generally In re White,* 315 B.R. 741

(Bankr. D. Neb. 2004).  *Compare and contrast In re Vrusho*, 321 B.R. 607 (Bankr. D.N.H. 2005)

(prior nonfraud-based state court judgment deemed not to be *res judicata* barring creditor's

fraud-based adversary complaint in bankruptcy; moreover, debtor's invoking of Fifth

---

Decision.

Amendment privilege in the adversary proceeding would allow the bankruptcy court to take

adverse inference and deem admitted all matters to which debtor claimed privilege).

No Massachusetts issue preclusion precedent has been found which evaluates the effect

of an invoking of the Fifth Amendment privilege in litigation.  This court therefore is left with:

(i) the general Massachusetts position of *Treglia* as to default judgments in predicate cases,

including the conclusion that discovery violation default judgments could be actually litigated

for collateral estoppel purposes; (ii) the proposition (followed in Massachusetts) that, though the

adverse inference does not, *by itself*, suffice to prove a cause of action, a case may be fully

decided through the presentation of probative evidence accompanied by the buttressing effect of

that inference; and (iii) federal precedent (*Rutledge, Bathalter* and *White*) rendering the

invocation of the privilege (whether viewed as "tactical" or otherwise) as not neutralizing the

litigation participation of the invoking party in the predicate case.  Based upon the foregoing,

this court concludes that the Massachusetts Supreme Judicial Court would rule, as in *Rutledge*,

that the mere invoking of the Fifth Amendment privilege does *not* disallow issue preclusion in

subsequent cases.

Accordingly, this court will apply issue preclusion *sub judice*, arising out of the Liability

Decision with regard to those issues decided there and essential to that decision.

**E.      Issues Decided in Liability Decision and Essential to That Decision.**

The issues actually litigated in the Superior Court *culminate* with the following factual

finding:  "Tulloch was the driver of the vehicle that struck Meghan Birdsall."  That finding is at

the heart of the civil action and is, for issue preclusion purposes, *essential*.  Given that the record

in the civil case and *sub judice* establish the date and time of injury at around 1 a.m. on Monday,

23

June 22, 1998, Tulloch's effort in this adversary proceeding to deny that he was in Boston at the

time of the accident (and that he drove his car into Ms. Birdsall) is *precluded*.[12]

------

[12]Though not necessary to this decision, this court questions the credibility of Tulloch as
to his stated whereabouts throughout the critical weekend.  In particular, he testified that his
usual stay on weekend trips to Boston was to Sunday night (Tr. 36:3-25 to 37:1-3), he slipped at
least once in reference to his return day on that June 1998 weekend (Tr. 16:1-9), and he was
admittedly drunk beyond consciousness for part of the weekend.  Given the degree of his
drunkenness, his ability to keep track of days must be questioned.  *Inter alia*, the witness was
"fidgety," on the edge of nervous giggling as he testified, obviously scripted, and thoroughly
unconvincing.

The Superior Court's summary judgment as to Tulloch's liability was, at a minimum, premised on his negligence,[13] which in turn centered on his drunkenness.[14]  These conclusions, too, were essential to the Liability Decision.

The plaintiff's *submissions* in support of his summary judgment motion in the Superior Court were not made available to this court by either party.  Whatever their composition, they well satisfied the state court judge.  This court sees no reason to look behind the Liability

---

[13]The complaint initiating the civil action, Exhibit A to Statement of Uncontested Facts, included a claim for negligence as the "least" of the tortious acts asserted against Tulloch. Therefore, the Liability Decision is minimally a finding of negligence.  Moreover, that Decision is careful to account for the corresponding defense of contributory negligence as follows:

> That finding [Tulloch as the hit-and-run driver] does not dispose of the issue of comparative negligence.  By order of the Court, however, the defendant is foreclosed from presenting expert testimony.  Further, the defendant has stated that he will not call any witnesses at trial and will not appear at trial.  He has not adduced evidence sufficient to give rise to a dispute of fact as to whether any negligence of Meghan Birdsall was a substantial contributing cause of the accident.[FN]

> [FN] Standing alone, the fact that Ms. Birdsall was riding or walking next to a bicycle on the service road near the intersection of Commonwealth Avenue and Brighton Avenue at 1:50 a.m. is not sufficient to raise a material question of fact as negligence on her part that was a substantial contributing cause of the accident.

[14]The Liability Decision emphasized Tulloch's refusal to provide discovery where plaintiff sought evidence "*inter alia*, as to whether Tulloch was intoxicated on the night of June 21-22, 1998, *and* whether he struck Ms. Birdsall with his car."  (Emphasis added.)  The adverse inference arising from the asserted Fifth Amendment privilege, as well as the preclusive effect of "discovery violation" sanctions were thus brought to bear on Tulloch.  The Superior Court judge ultimately marshaled Tulloch's own statements about heavy drinking ("his statements that he drank to the extent that he reached the blackout stage and may have hit someone on . . . Friday night. . . ."), and the inference adverse to Tulloch, in finding him liable.  Intoxication and the running down of Ms. Birdsall were intertwined by Judge Kottmyer, an understandable linkage in this witnessless hit-and-run case where the defendant had, early on, made a series of damaging statements but then stymied discovery efforts in the civil action.

25

Decision, particularly since the "Summary Judgment Record" was recited amply therein (along with edifying "Conclusions of Law," "Discussion" and the ultimate "Conclusion").[15]

In sum, this court finds and concludes that Tulloch is precluded from disputing the following essential findings and conclusions of the Superior Court:

      (i)      "Tulloch was the driver of the vehicle that struck Meghan Birdsall";

      (ii)     Tulloch was negligent in operating his vehicle; and

      (iii)    Tulloch had been drinking, *and was intoxicated at the time of the accident*.

Moreover, as will be described hereinafter, trial of the adversary proceeding adduced further support for the finding that Tulloch was drunk when he drove his car into Ms. Birdsall.

## VI.    Section 523(a)(9) Proofs.

Section 523(a)(9) excepts from discharge an individual's debt "for death or personal injury caused by the debtor's operation of a motor vehicle, vessel, or aircraft if such operation was unlawful because the debtor was intoxicated from using alcohol, a drug, or another

---

[15]Accordingly, the summary judgment submissions were deemed to be of sufficient probative weight "in combination with the adverse inference created by the defendant's assertion of the Fifth Amendment." *Sub judice*, at trial plaintiff's counsel raised the specter of "*Rooker-Feldman*" as barring this court's review of the Superior Court's determinations. That doctrine, however, has been reined in substantially by the Supreme Court and would not apply here. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (holding that the doctrine only applies to cases (1) "brought by state-court losers complaining of injuries caused by state-court judgments," and (2) "inviting district court review and rejection of those judgments."); *Lance v. Dennis*, 126 S.Ct. 1198, 1202 (2006) ("The doctrine applies only . . . where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court" (citations omitted)); *In re Knapper*, 407 F.3d 573 (3d. Cir. 2005) (applying the *Rooker-Feldman* bar in circumstances where debtor, after losing in state court foreclosure proceeding, initiated in bankruptcy an attack on state court foreclosure judgments). However, the Full Faith and Credit Statute, 28 U.S.C. § 1738, requires this court to give credence to the Liability Decision. This is particularly the case given the absence of a clear overriding precept of the Bankruptcy Code (or an issue rising to the level of a Due Process violation).

substance. . . ."  Tulloch's liability "for [Meghan's] death . . . caused by [his] operation of a

motor vehicle . . . [while] intoxicated from using alcohol" is established by the Liability Decision

(and he is precluded from disputing same).  Whether Debtor's operation of that motor vehicle

was *unlawful because he was intoxicated* is an issue which requires further analysis.

A.    **Massachusetts Law**.

State law is utilized to determine whether a debtor is legally intoxicated for

exception-to-discharge purposes.  *Whitson v. Middleton*, 898 F.2d 950, 952 (4th Cir. 1990)

(pre-1990 version); *In re Cunningham*, 48 B.R. 641, 644 (Bankr. W.D. Tenn. 1985) (pre-1990

version) (§ 523(a)(9) "allows the court to rely on state laws or regulations in determining

whether debtor was legally intoxicated at the time of the accident," in contradistinction to the

court's having to find the drunken driver "willful and malicious" under § 523(a)(6) before

§ 523(a)(9) was enacted); *In re Brozek*, 1993 WL 452670, at *2) (Bankr. D. Minn. 1993).  The

bankruptcy court may make its own finding of intoxication under the relevant state law.  *In re

Crump*, 321 B.R. 879, 882 (Bankr. N.D. Ohio 2004) ("§ 523(a)(9) empowers a bankruptcy court

to make an independent determination as to whether, under applicable law, a person operated a

motor vehicle while unlawfully intoxicated"); *In re Phalen*, 145 B.R. 551, 554 (Bankr. N.D.

Ohio 1992) ("[l]egal intoxication . . . does not have to be specifically adjudicated by a state court

for the purposes of determining nondischargeability under § 523(a)(9)").  If state law does not

require a Breathalyzer test or a determination of blood alcohol level to make a finding of legal

intoxication, then the bankruptcy court does not require these elements to make a finding of legal

intoxication under § 523(a)(9).  *In re Wiggins*, 180 B.R. 676, 679-80 (M.D. Ala. 1995).

Under Massachusetts law, "[w]hoever, upon any way . . . to which the public has a right

of access . . . operates a motor vehicle with a percentage, by weight, of alcohol in their blood of

eight one-hundredths or greater, or *while under the influence of intoxicating liquor* . . . shall be

punished [by fine or imprisonment or both]." Mass. G.L.A. 90 §24(1)(a)(1) (emphasis supplied).

Interpretation of the statutory "under the influence"[16] standard for illegal motor vehicle

operation: (i) does *not* require proof that the defendant was "drunk"; (ii) does *not* require proof

that the defendant "actually drove unskillfully or carelessly"; and (iii) does *not* require proof that

the defendant "*actually drove* in an unsafe or erratic manner." Proof is required "that

consumption of alcohol diminished the defendant's *ability* to operate a motor vehicle safely,"

i.e., proof of "a diminished *capacity* to operate safely." *Commonwealth v. Connolly*, 394 Mass.

169, 172-73, (Mass. 1985) (emphasis in original). In a civil case context, violation of Mass.

G.L.A. § 24(1)(a)(1) constitutes some evidence of negligent operation of a motor vehicle. *See,*

*e.g., Petras v. Storm*, 18 Mass. App. Ct. 330, 465 N.E. 2d 283 (1984). Moreover, the statutory

violation may be established "entirely on circumstantial evidence." *Commonwealth v.*

*Cromwell*, 56 Mass. App. Ct. 436, 438-39, 778 N.E.2d 936, 939 (2002).[17]

---

[16]In fact, the alternate standard of blood alcohol percentage by weight appears to have
been added to the statute after June 22, 1998.

[17]  *Cromwell* recites:

> Because no one saw him driving and he made no admission of
> operation, the defendant claims he was entitled to a required finding
> of not guilty as matter of law. The absence of such direct evidence,
> however, is not dispositive, as "a conviction may rest entirely on
> circumstantial evidence." *Commonwealth v. Woods,* 414 Mass. 343,
> 354, 607, N.E.2d 1024, *cert. denied*, 510 U.S. 815, 114 S.Ct. 65, 126
> L.Ed.2d 35 (1993). *Commonwealth v. Walter*, 10 Mass. App. Ct.
> 255, 257, 406 N.E.2d 1304 (1980) (footnote omitted). As to
> circumstantial evidence establishing driving under the influence, *see*
> *Commonwealth v. Reynolds*, 2003 WL 22922655 at *1, *9 (Mass.
> Super. Oct. 16, 2003).

It is thus plain to this court that the essence of Judge Kottmyer's Decision  –  that Tulloch was intoxicated at the time of the accident[18] – is synonymous with a conclusion that drinking diminished his capacity to operate his car safely.  Hence, Tulloch's operation of his motor vehicle was "unlawful."

The testimony of Tulloch before this court as to the degree of his drunkenness on the critical weekend supports the conclusion of the Massachusetts judge.  While she was denied access to the most direct evidence of Tulloch's intoxication because of his discovery violations and Fifth Amendment privilege exercise, testimony before this court was corroborative (as well as startling).  Tulloch described his drunkenness (i) as having obliterated his senses to the point where he was *operating a vehicle on a highway* when he "came to," *and* (ii) as being even more pronounced than his unlawful drunken state when he lost his license for six months.

Moreover, as set forth immediately below, excepting the Birdsall claim from discharge comports with the Bankruptcy Code, the historic development of § 523(a)(9), and cases interpreting that section.

**B.      Development and Interpretation of § 523(a)(9).**

Before 1984 claimants against drunk drivers could have their claims excepted from bankruptcy discharge only by attempting to characterize drunk driving as "willful."  *See* § 523(a)(6).[19]  Yet, in the majority of states such a characterization did not comport with law.

---

[18]*See* footnote 14, *supra*.

[19]Plaintiff's claim of exception to discharge based upon the debtor's alleged "willful and malicious" injury to Ms. Birdsall per § 523(a)(6) has not been proven.  This court finds no supporting facts to establish Tulloch's state of mind as willful and malicious.  *See Kawaauhau v. Geiger*, 523 U.S. 57 (1998).  Under extraordinary circumstances claims based upon drunk driving have been held to qualify for that exception to discharge.  *See, e.g., In re Dale*, 199 B.R. 1014 (Bankr. S.D. Fla. 1995).  However, this court concludes that the addition of § 523(a)(9) to

Senator Danforth, in proposing a remedy (ultimately morphing into the new § 523(a)(9)

exception), explained:

> Today there exists an unconscionable loophole in the bankruptcy
> statute which makes it possible for drunk drivers who have injured,
> killed, or caused property damage to others to escape civil liability
> for their actions by having their judgment debt discharged in
> Federal bankruptcy court. This loophole affords opportunities for
> scandalous abuse of judicial processes.

129 Cong. Rec. S1622 (daily ed. Feb. 24, 1983).

However, the first iteration of the drunk driving exception to bankruptcy discharge in

1984 required "a judgment or consent decree entered in a court of record against the debtor

wherein liability was incurred by such debtor as a result of the debtor's operation of a motor

vehicle while legally intoxicated. . . ."  This text prompted debate over whether the judgment or

consent decree had to be obtained *prepetition*.  Answering the question in the negative, the Ninth

Circuit endorsed near unanimous lower court decisions:

> These courts have reasoned that, *given the clear intent of Congress
> to prevent drunken drivers from escaping liability by discharging*

---

the Bankruptcy Code was, in part, recognition of the difficulty in applying § 523(a)(6) to the prototypical drunk driving case, including problems proving the requisite state of mind under that exception.  Most bankruptcy courts now hold that § 523(a)(9) exists to allow a court to except a debt from discharge without having to determine whether voluntary operation of a motor vehicle while intoxicated was willful and malicious.  *See, e.g., In re Scholz*, 111 B.R. 651, 652-53 (Bankr. N.D. Ohio 1990) ("Section 523(a)(9) is a further embodiment of the 'willful and malicious' element required for a finding of nondischargeability under § 523(a)(6), as the 1984 Amendments to the Code intended to establish the presumption of the willful and malicious nature of driving while intoxicated" (*citing In re Richards*, 59 B.R. 541, 543 (Bankr. N.D.N.Y. 1986)); *Dougherty v. Brackett*, 51 B.R. 987, 988 (Bankr. D.Colo. 1985) (Congress enacted § 523(a)(9) in response to decisions that found drunk driving not "willful and malicious" conduct).  The section's legislative history confirms this.  130 Cong. Rec. H. 7489 (June 29, 1984) (Statement of Rep. Rodino), reprinted in 1984 U.S. Code Cong. and Admin. News 576, 577 ("Section 523(a)(9) clarifies the present law relating to the nondischargeability of debts incurred by drunk drivers.  Debts incurred by persons driving while intoxicated are presumed to be willfully and maliciously incurred under this provision").

> *debts in bankruptcy*, adherence to a requirement that a creditor first
> obtain a "judgment or consent decree" would effectively nullify the
> statute. Such an interpretation would merely encourage drunk drivers
> to file preemptively for bankruptcy once it became clear that they
> would be held civilly accountable for their actions. As the court
> observed in *In re Thomas*, 51 B.R. 187 (Bkrtcy. E.D. Va. 1985), "[a]s
> worded, the legislation gives quick-thinking drunks or their attorneys
> an out. If they can race to the U.S. Bankruptcy Court before the
> injured can obtain a state court judgment, the intoxicated debtor can
> still prevail." *Id.* at 188-89. The court went on to note that such a
> "race" would give the debtor a clear advantage since it takes
> "considerably longer to obtain a judgment than it does to file
> bankruptcy." *Id.* at 189. Concluding that Congress could not have
> intended this result, the court gave "[a] creditor who has not had
> reasonable time to seek a judgment in state court . . . leave of this
> court to diligently prosecute his claim in state court." *Id.* at 189.

*In re Hudson*, 859 F.2d 1418, 1420 (9th Cir. 1988) (emphasis added). Note the strong

plain-language based dissent, *id* at 1424, supporting affirmance of the Ninth Circuit Bankruptcy

Appellate Panel's decision *contra*. Later Code amendment[20] supported the concept announced

by the *In re Hudson* majority, removing the possibility of a race to the bankruptcy court being

determinative in such matters. The intent of Congress to prevent drunk drivers from "escaping

liability by discharging debts in bankruptcy" is thus carried forward in the current text of

§ 523(a)(9).

---

[20]11 U.S.C. § 523(a)(9) was amended by the Crime Control Act of 1990 and a companion
statute (enacted in both Pub. L. No. 101-647 on November 29, 1990 and in Pub. L. No. 101-581
on November 15, 1990) to include three significant new elements. The amendment (1) removed
the requirement for the existence of a judgment as a prerequisite to exception from discharge; (2)
added drug-based intoxication as a cause for the exception; and (3) added the requirement that a
victim has suffered personal injury or death to bring the debt within the exception. *See* 4 ALAN
N. RESNICK AND HENRY J. SOMMER, COLLIER ON BANKRUPTCY § 523.15 (15th ed. Revised 2007).
The 2005 amendment (Pub. L. No. 109-8, § 1209), effective for bankruptcy cases commenced on
or after October 17, 2005 and not germane to this case, added the operation of an aircraft or
vessel while intoxicated to the acts which may except a debt from discharge under § 523(a)(9).

The standard of proof for determining exceptions to discharge under § 523(a),

preponderance of the evidence per *Grogan v. Garner*, 498 U.S. at 291, is to be applied in

determining whether the debtor was legally intoxicated under state law.  *In re Phalen*, 145 B.R.

at 554, *citing Whitson*, 898 F.2d at 952.  *See also In re Wiggins*, 180 B.R. at 679-80 (though the

Alabama statute required a finding of intoxication under the standard of criminal culpability, it

was held that the Bankruptcy Code proof standard for intoxication under § 523(a)(9) is

preponderance of the evidence); *In re Caffey*, 248 B.R. 920, 923-24 (Bankr. N.D. Ga. 2000).  As

demonstrated in *Caffey*, the Georgia statute has, in the alternative, a blood alcohol element and

an element which makes it unlawful for a person to drive "'under the influence of alcohol to the

extent that it is less safe for the person to drive.'"  *Id.* at 923-24 (*citing* GA. CODE ANN.

§ 40-6-391).   The debtor-defendant was found *not guilty* in a criminal proceeding on two counts

of violating the statute under the criminal standard of proof (beyond a reasonable doubt) but, by

failing to respond to plaintiff's request for admissions in the subsequent adversary proceeding,

was deemed to have admitted that he had been a "less safe" driver under the influence of alcohol.

Given the standard for proof of intoxication under § 523(a)(9) (preponderance of the evidence)

and because the debtor was deemed to have admitted the dispositive element of the statute, the

drunk driving-based debt was excepted from discharge.  *See also In re Hart*, 347 B.R. 635, 638

(Bankr. W.D. Mich. 2006) ("There is no requirement in the bankruptcy statute that the

Defendant must actually be charged and convicted with an alcohol related crime, just that his

motor vehicle operation was unlawful").[21]

---

[21]Evidentiary issues in dischargeability determinations are governed by the Federal Rules
of Evidence.  *In re G. Barnes*, 266 B.R. 397, 403 (B.A.P. 8th Cir. 2001):

Although the bankruptcy court must apply state law to resolve the

Generally, courts have held that it is not necessary to prove that intoxication was the *cause* of the accident. *In re Wagner,* 2007 WL 966010, at *5 (E.D. Pa. 2007) (Golden, J.). *See also Whitson v. Middleton*, 898 F.2d at 953 (under pre-1990 version); *In re Thornton*, 2003 WL 25295857, at *4 (Bankr. S.D. Fla. 2003) ("Judgments are non-dischargeable upon a mere showing that the debtor was driving while intoxicated without proving that the intoxication was the principal or sole cause of the accident"), *citing State Farm Mut. Auto. Ins. Co. v. Kupinksy*, 133 B.R. 993, 998 (Bankr. S.D. Ill. 1991) (pre-1990 version) (where the prior version of § 523 (a)(9) required only the entry of a judgment for *liability*, there was no requirement that the judgment had been entered "on a showing that the Debtor's intoxication was the principal or sole proximate cause of injury"); *In re Hodak*, 119 B.R. 516, 520 (Bankr. W.D. Pa. 1990) (Markovitz, J.) (under pre-1990 version). On occasion, courts have held that it is necessary to prove that intoxication was the cause of the accident. *See, e.g., In re Crump*, 321 B.R. at 882. *Sub judice*, as indicated earlier, causative linkage of Tulloch's epic drunkenness to his negligence and the resulting fatal accident is inherent in Judge Kottmyer's decision.

Plaintiff has carried his burden of proving the § 523(a)(9) exception to discharge by collateral estoppel, and nothing in the interpretation of that section gives this court cause to view the Superior Court Liability Decision as anything but dispositive here.

---

substantive issues under section 523(a)(9), the Federal Rules of Evidence apply in all proceedings under the Bankruptcy Code, including adversary proceedings. Fed. R. Bankr. P. 9017; Fed. R. Evid. 1101(a). Thus, even when the bankruptcy court applies state law to resolve substantive issues, it must apply the Federal Rules of Evidence to resolve evidentiary questions.

33

## VII.   __Conclusion__.

Tulloch, having failed in his attempt to stymie the Massachusetts court by refusing to submit to discovery and asserting his Fifth Amendment privilege (while fending off criminal prosecution by his silence), would now use the bankruptcy court to avoid his debt.  However, Judge Kottmyer's finding that he was the drunk driver who struck Meghan Birdsall in the early morning hours of June 22, 1998, is preclusive *sub judice*.  But for the hit-and-run driver, there were no surviving witnesses to the accident; Mr. Tulloch, in denying that he was the witness, did not give a good account of himself when he finally testified some nine years after the accident. He admitted being blind drunk by any measure; his coached testimony was without detail, being all too cryptic to be believable (either as to his card-playing gambit or his return to New Hampshire on the Saturday before the accident).  Indeed, Tulloch allowed that when he slept over in Boston, he would more often return to his home after recreational weekends on *Sunday nights*, and his all-too tentatively asserted card-playing story was nothing more than a bare statement (missing specific time of events, names of the card-playing participants, and other such defining details).

Tulloch has played out his hand; he may well have hoped to slip between the civil suit and criminal jeopardy, escaping both.  Judge Kottmyer saw fit to hold him accountable.  Again, Tulloch may have hoped, after the passage of years, to use the bankruptcy system to avoid the effect of the Massachusetts judgment.  Apparently sufficient time had passed to impel Mr. Tulloch to abandon his strategy of Fifth Amendment privilege assertion in civil matters, and to take the stand in the bankruptcy court to deny, fully, his involvement in Ms. Birdsall's death.  In the 2001 Massachusetts civil case, and right up to its conclusion in the Summer-Fall of 2005,

34

Tulloch could have satisfied his discovery obligations and voiced, in detail, his defense.  He chose not to do so.

Bankruptcy is not a safe haven for those who fail in their strategies of treading water in civil litigation to fortify against criminal jeopardy.  The fact that a hit-and-run death is witnessless but for the driver, does not deny a plaintiff the opportunity to prove a civil case, by circumstances and through discovery.  And, when a litigant in defense denies plaintiff that opportunity, there is jeopardy of a judgment.  There is, as well, jeopardy that issue preclusion will be adhered to fully and faithfully by a bankruptcy court in excepting that judgment from discharge.

For all of the reasons set forth herein, the entire debt due on the Massachusetts Judgment is excepted from Mr. Tulloch's bankruptcy discharge.  This court will issue its implementing Order and Judgment.


Dated:  August 28, 2007                              /s/ Morris Stern
                                                     MORRIS STERN
                                                     United States Bankruptcy Judge


35